**DEVILS LAKE SIOUX
TRIBE, Plaintiff,**

v.

**STATE OF NORTH DAKOTA; the Garrison Conservancy District; the United States of America; 101 Ranch, a North Dakota Partnership; Steve Ward; Imogene Christensen; Claire Engelhardt; Carlyle Brye; Arnold and Vernyll Yri; Ernest and Ruby Martinson; Miles and Dorothea Maddock; Olaf and Mabel Solheim; Leo and Minnie Johnston; and Francis P. and Gloria Schneider, Defendants.**

Civ. No. A2–86–87.

United States District Court,
D. North Dakota,
Northeastern Division.

April 18, 1989.

Douglas B.L. Endreson, Sonosky, Chambers & Sachse, Washington, D.C. (Marvin J. Sonosky, of counsel), and Lreen Steffan, Tribal Atty., Ft. Totten, N.D., for plaintiff.

Atty. Gen. Nicholas Spaeth, Sp. Asst. Attys. Gen. Murray G. Sagsveen and Michael Fiergola, Bismarck, N.D., for State of N.D.

Rodney S. Webb, U.S. Atty., Fargo, N.D. (K. Jack Haugrud, Gen. Litigation Sec., Land and Natural Resources Div., Washington, D.C., of counsel), and Margot Zellan, Dept. of Interior, Denver, Colo., for U.S.

Frank T. Knox, Lanier, Knox & Olson, Fargo, N.D., for 101 Ranch and independent defendants.

## MEMORANDUM AND ORDER

BENSON, Senior District Judge.

The subject matter of this case is the ownership of the bed of Devils Lake, a large lake located in northeastern North Dakota. The lake is adjacent to the Devils Lake Sioux Tribe Indian Reservation. The specific issue presented is whether the lake is part of that reservation. The plaintiff, the Devils Lake Sioux Tribe, claims that the United States holds title to the bed of the Devils Lake in trust for the Tribe, that Devils Lake is part of the reservation, and that the Tribe is entitled to immediate possession of the lake bed. The defendants are parties that claim or may claim an interest in the lake bed. The United States has moved for summary judgment.

 The plaintiff alleges the court has jurisdiction under 28 U.S.C. §§ 1362 and 1331 and that the United States has waived its sovereign immunity under 28 U.S.C. § 2409a. By its own terms, section 2409a "does not apply to trust or restricted Indian lands." In this case, the plaintiff alleges that the bed of Devils Lake is trust land. In *United States v. Mottaz*, 476 U.S. 834, 842, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986), the Supreme Court held that this exclusion "operates solely to retain the United States' immunity from suit by third parties challenging the United States' title to land held in trust for Indians." Because the plaintiff is not a third party challenging the United States title to land held in trust, the exclusion does not apply.

## BACKGROUND

### Plaintiff

The Devils Lake Sioux Tribe occupies the Devils Lake Indian Reservation in northeastern North Dakota. It is a constituent part of the Sisseton and Wahpeton Sioux Bands. The Tribe's claim to the bed of Devils Lake is based on the Treaty of February 19, 1867, 15 Stat. 505. The Sisseton and Wahpeton bands of Dakota Sioux Indians and the United States were parties to

that treaty which contained two articles of particular significance.

Article II provided for an Indian cession allowing the United States to construct roads, railroads, mail stations, telegraph lines and other public improvements over a large parcel of land described as:

being bounded on the south and east by the treaty line of 1851 and the Red river of the North and to the mouth of the Goose river; on the north by the Goose river and a line running from the source thereof by the most westerly point of Devil's lake to Chief's Bluff at the head of the James river, and on the west by the James river to the mouth of Moccasin river, and thence to Kampeska lake.

Treaty of February 19, 1867, art. II, 15 Stat. at 506.[1]

The land covered in this article was ceded outright to the United States by agreement in 1872. In 1873, Congress approved the agreement with payment of $800,000 in ten annual installments of $80,000 each. Treaty of February 14, 1873, 17 Stat. 437, 456, *confirmed* Act of June 22, 1874, ch. 389, 18 Stat. 146, 167.

Article IV of the 1867 treaty provided for the Devils Lake Reservation, which was described as follows:

Beginning at the most easterly point of Devil's Lake; thence along the waters of said lake to the most westerly point of the same; thence on a direct line to the nearest point on the Cheyenne river; thence down said river to a point opposite the lower end of Aspen Island, and thence on a direct line to the place of beginning.

Treaty of February 19, 1867, art. IV, 15 Stat. at 506.

Plaintiff relies primarily on Article IV. It argues that the "thence along the waters" passage means that the boundary follows the north side of Devils Lake, and that the lake is within the reservation.

### Defendants

The defendants fall into three groups: the State of North Dakota, the United

---

1. The treaty line of 1851 was a boundary described in the Treaty of traverse des Sioux of July 23, 1851, 10 Stat. 949. It is of no particular significance in this litigation.

States, and numerous private individuals who own property adjacent to the lake bed. The private individuals were originally named plaintiffs in *101 Ranch v. United States*, 714 F.Supp. 1005 (D.N.D.1988). The private individuals' claims arise from their rights as riparian lake shore owners. The State of North Dakota's claim to the lake bed is based on the equal footing doctrine. Under this doctrine, the State of North Dakota, at the time of statehood, took title to the lands under all navigable waters within its boundaries. *See Utah Division of State Lands v. United States*, 482 U.S. 193, 196, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987). The United States' is based, *inter alia*, on a 1971 quitclaim deed from the State.

## DISCUSSION

█ In its initial motion for summary judgment, the United States argued that the plaintiff could have raised the present claims in prior litigation before the Indian Claims Commission (Commission). In its "Supplemental Memorandum in Support of its Motion for Summary Judgment," the United States argues that the plaintiff did actually litigate and settle the present claims before the Commission. The court has reviewed the statutes and record and concludes that the United States is entitled to summary judgment.

### Prior Litigation

In 1946 Congress established the Indian Claims Commission. *See* Act of Aug. 13, 1946, ch. 959, 60 Stat. 1049. The Commission was terminated in 1978. The Commission was empowered to hear claims arising out of treaties with the United States. On August 11, 1951, *Lower Sioux Indian Community v. United States*, Docket No. 363 was filed with the Commission. The plaintiff was party to that litigation.[2]

In 1969, the Indians amended their docket No. 363 petition. The amendment had two components. The first sought compensation for the use or taking of lands on the reservation provided in Article IV of the 1867 treaty. This is referred to as the "reservation claim." [3] The second sought compensation for the land ceded in Article II of the 1867 treaty, as provided in the 1872 agreement and confirmed by Congress. This is referred to as the "aboriginal claims." [4]

The reservation and aboriginal claims proceeded separate from one another. The Commission issued its decision on the reservation claims on June 30, 1973. *Lower Sioux Indian Community v. United States*, 30 Ind.Cl.Comm. 463 (1973). The Commission determined the United States' liability on the claims and determined the appropriate compensation to be $2,397,-950.19. *Id.* at 531–32.

The aboriginal claims proceeded somewhat differently. On September 25, 1975, the Commission entered an opinion determining the United States' liability on the aboriginal claim. The Commission then ordered that the case proceed to determine the acreage and fair market value of the land involved. *Lower Sioux Indian Community v. United States*, 36 Ind.Cl.Comm. 472, 496 (1975).

After the Commission entered its order of September 25, 1975, the Indians and the United States engaged in settlement discussions. The essence of the discussions

---

**2.** Commission docket no. 363 was fully captioned as "Lower Sioux Indian Community in Minnesota; Prairie Island Indian Community in Minnesota, Sam Wells, Samuel Bluestone, Reuben Kitto, Agnes Campbell Lawrence and Minnie Otherday Weldon, on behalf of the Sioux of the Mississippi and the Mdewakanton Band of Sioux Indians; and Henry St. Claire and Lena Whipple Campbell, on behalf of the Sioux of the Mississippi and the Wahpakoota Band of Sioux Indians, Petitioners, vs. the United States, Defendant." The Sioux of the Mississippi includes the Sisseton and Wahpeton Band of Sioux Indians. The Devils Lake Sioux is a successor.

**3.** The reservation claim included a claim for use of land as a military reservation from 1867 to 1890; a claim for 64,000 acres excluded from the reservation by erroneous survey in 1875; and claims on various parcels taken under sections four and five of the Act of April 27, 1904, ch. 1620, 33 Stat. 319.

**4.** The term "aboriginal claim" refers to the Indians' title claim to land based on a native claim to the land.

was that the Indians were willing to settle the case for $1.50 per acre. Ultimately, the parties reached a compromise settlement. On September 8, 1977, the Commission entered its "Findings of Fact on Compromise Settlement, Order Approving Compromise Settlement, Final Award, and Additional Final Award." *Lower Sioux Indian Community v. United States*, 41 Ind.Col. Comm. 1, 16, 18, 139 (1977). In this claim, the Indians argued that the $100,000 paid under the 1872 agreement was unconscionable.

The United States argues that the settlement included Devils Lake. Specifically, it argues that the lake was covered in the compromise settlement wherein the United States paid plaintiff for the Devils Lake lake bed. The plaintiff argues that Devils Lake was explicitly excluded from the case.

### Whether Devils Lake was included in Docket Number 363

To determine whether the bed of Devils Lake was included in the compromise settlement, the proceedings before the Indian Claims Commission in docket number 363 must be reviewed.

The Commission's opinion on the reservation claims included a description of the land involved. Although the reservation claims and the aboriginal claims were decided separately, each was a part of the same case. The land description in the reservation claims is useful in determining the scope of the litigation. In its discussion, the Commission stated:

> The Devils Lake Reservation and the Fort Totten military reserve, located on reservation land, are in the east-central part of North Dakota, *south of Devils Lake*, with the major part of the reservation located in Benson County, and small portions in Eddy, Nelson, Ramsey and Wells counties. The land is rolling to gently rolling, with the lowest elevation at the north and south boundaries, rising to the highest point in the central portion of the reservation.

*Lower Sioux Indian Community*, 30 Ind. Cl.Comm. at 483 (emphasis added).

Later, the Commission stated:

> The reservation is located in east-central North Dakota. The main portion of the reservation, *lying south and west of Devils Lake*, is located in five present-day counties of the state, specifically Benson County, where the main portion is situated, and Eddy, Wells, Nelson and Ramsey counties.

*Id.* at 500–01 (emphasis added). From these two passages, it is evident that the Commission understood the reservation to be south of the lake. There is no suggestion that the lake was part of the reservation.

The Commission's September 25, 1975 opinion and findings of fact on liability for the aboriginal claims contained a section entitled "The area in suit." It simply recited the provisions of Article II of the 1867 treaty set out above and excepted the reservation as set out in Article IV of the 1867 treaty. *See Lower Sioux Indian Community v. United States*, 36 Ind.Cl.Comm. at 485–86. Elsewhere in the opinion, however, the Commission stated as follows:

> The cession, according to the [1872] agreement, extended as well to all other land in Dakota Territory to which the Sissetons and Wahpetons had title or interest; but it did not include the Lake Traverse and Devil's Lake Reservation,[2] which were set aside in Articles 3 and 4 of the 1867 treaty.

[2] The area described in the 1867 treaty is identified in Charles C. Royce, *Indian Land Cession*, as Areas 538 and the southern part of 445, plus the reservation areas, Nos. 496 and 497. See Royce's map of North and South Dakota (Plate 11) in the 18th Annual Report of the Bureau of American Ethnology, Part II (1899).

*Id.* at 473 & n. 2.

The "areas" referred to above are commonly called "Royce areas," and the numbers are commonly called "Royce numbers." The *Eighteenth Annual Report of the Bureau of American Ethnology* (1899) contained a section entitled "Indian Land Cessions in the United States." This was compiled by Charles C. Royce. Royce's work included text and maps setting out various parcels of land that were subject to treaty, cession, or reservation with the In-

dians. The individual parcels of land are color coded and assigned unique numbers. The parties and the Commission referred to Royce numbers in this case. Exhibit 1, attached to this opinion, is a reproduction of the relevant Royce map pertaining to this case.

The amended petition raising the aboriginal claims identified the land involved by Royce numbers. Paragraph 19 of the Indians' amended petition provided:

19. At all times herein material, the Bands were the owners of lands in North and South Dakota, identified as Royce Nos. 538, 496 and 497, and that portion of Royce No. 445 south of Goose River, more particularly defined ...

Similar Royce numbers were used in oral presentations before the Commission, as shown in the following transcript materials:

MR. SONOSKY [Indians' attorney] * * *
The 1867 Treaty in addition to defining the country, outlined two reservations, and set them aside, one for the Sisseton at Lake Traverse and one for the Sisseton and Wahpeton at Devils Lake. And the 1867 Treaty description of the land embraces Royce 538, which the Commissioner will see is marked, and Royce 496, which is the Lake Traverse reservaton.
COMMISSIONER VANCE: I've got them reversed. What was that; Royce 638?
MR. SONOSKY: And Royce 497. Royce 538 is the cession. Royce 496 is the Lake Traverse reservation, and Royce 497 is the Devils Lake reservation.
The Commissioner will note that—
COMMISSIONER VANCE: 538 is Lake Traverse?
MR. SONSKY: No. Royce 538 is the cession.
COMMISSIONER VANCE: That is the entire cession; I've got you.
MR. SONSKY: Royce 496 is the Lake Traverse reservation, and 497 is Devils Lake.
COMMISSIONER VANCE: Okay.

Exhibit 1 shows Royce areas 497, 496, and 538. Area 497, the Devils Lake Reservation, is in purple. It is a small portion of land encompassed within area 538. The plaintiff asserts that the Royce map is of no help in determining the scope of the prior litigation. The plaintiff asserts that Devils Lake is excluded from both Royce Area 538 and Royce area 497. In examining the Royce maps, the court finds the boundary for the reservation to be very clear. It is Royce area 497. On the other hand, the lake is clearly within Royce area 538. The plaintiff's argument to the contrary is not supported by the record and is without merit. The description given in the documents before the Commission show the Devils Lake to have been included in the case.

The plaintiff also asserts that the lake would not have been included in this case because the Commission never assigned separate values to bodies of water in Commission litigation. Plaintiff thereby alleges that the scope of the settlement judgment did not include the lake. The plaintiff cites several cases in support of its proposition. *See, e.g., Mohave Indians v. United States,* 23 Ind.Cl.Comm. 87 (1970); *Lummi Tribe v. United States,* 10 Ind.Cl.Comm. 286 (1962); *Con-federated Tribes of the Colville Reservation v. United States,* 7 Ind. Cl.Comm. 187 (1959).

The cited cases are all distinguishable. First, they all involved *portions* of navigable waters. In *Mohave Indians,* 23 Ind.Cl. Comm. at 90, the Commission cited the general rule that there is no private ownership of navigable bodies. For that reason, no separate value was assigned. In the instant case now before this court, the Devils Lake was *entirely within* Royce area 538. It follows that no issue of private ownership of a *portion* of a navigable body arose in docket 363.

Second, although the plaintiff argues that the Commission never considered the acreage of bodies of water, its argument overlooks the fact that the acreages in docket 363 were reached by compromise settlement of the parties. Pursuant to the settlement offer by the Tribe, the acreages were determined by the Bureau of Land Management (BLM). Review of the

records show that the lake was included. The following is a listing of the acreages added and subtracted to obtain the total acreage at issue:

| Acreages Added: | |
|---|---|
| Royce area 538 | 6,355,000 ac. |
| Area outside of area 538 in Article II of the 1867 Treaty, including acreage for Devils Lake Reservation and excluding Lake Traverse Reservation | 2,800,000 ac. |
| Southern Triangle | 565,000 ac. |
| Gross Acreage | 9,720,000 ac. |
| | |
| Acreages Subracted: | |
| Turtle Mountain overlap | (138,000 ac.) |
| Omitted lands [5] | (64,908 ac.) |
| Devils Lake Reservaton | (230,651 ac.) |
| Total Acreage | 9,286,441 ac. |

The area considered by the BLM in determining acreage, is outlined in an August 1, 1977, letter to an Assistant Attorney General of the Lands and Natural Resources Division of the United States Department of Justice from the Acting Chief of the Division of Cadastral Survey of the BLM. A copy of that letter has been filed in this case. It clearly shows that the BLM considered the acreage of Royce area 538. As noted above, the lake is within area 538. No exception for the lake was noted. As to the overlap acreage, the BLM identified the 138,000 acres as "Overlap with Turtle Mountain Band of Chippewa Indians, Docket Nos. 113, et al—land area only; disregard water area of Devils Lake per your instructions. Derived by plotting Devils Lake from the earliest official Government Land Office survey plats." Devils Lake was excluded from the BLM computation as directed by the Department of Justice attorney. From this, it is clear that the lake was included in the area 538 acreage and not deducted in the overlap acreage.

The overlap region involves land in area 538 determined in *Turtle Mountain Band of Chippewa Indians v. United States*, 23

Ind.Cl.Comm. 315 (1970), *aff'd on rehearing*, 26 Ind.Cl.Comm. 336, 361–62 (1971), to belong to the Chippewa Tribe. The line of overlap ran through Devils Lake and included property north of that line. The settlement provided for the exclusion of the overlap.

Last, the plaintiff asserts that the United States "admits" that the lake was not an issue in docket 363. This is a distorted reading of the United States' position. Clearly what the United States said was that the lake was never pulled out or isolated from the rest of the land. For that reason the United States says the lake was not an issue in docket 363.

## SUMMARY JUDGMENT

The United States' motion for summary judgment is before the court. A motion for summary judgment is granted if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c).

*Genuine Issue of Material Fact*

The plaintiff argues that there is a genuine issue of material fact based on the affidavit of Marvin Sonosky. Sonosky was the Indians' counsel of record in docket 363. In his affidavit, he states, "At no time was any question raised as to the acreage underlying the waters of Devils Lake. The Government did not include land under water in fixing the acreage for which the Government was agreeing to pay $1.50 per acre." [6] In determining whether there is a genuine issue of material fact, the court does not weigh the evidence presented, but the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5. *See* footnote 3, *supra*.

6. In its brief, the plaintiff misquotes Sonosky as saying, " '[a]t no time was any question raised as to the acreage including the waters of Devils Lake.' " Plaintiff's response to the Supplemental Memorandum of the United States in Support of its Motion for Summary Judgment at 5.

242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). A scintilla of evidence is insufficient. *Id.* at 252, 106 S.Ct. at 2512. There must be evidence on which the jury could reasonably find for the plaintiff. *See id.*

Here, counsel has filed an affidavit stating what the opposing party did during prior litigation. No documentary evidence or specific proof is presented. On the other side is a countemporaneous letter from the BLM explaining their methods. With this evidence, the court finds no basis for submitting the issue to a jury. The affidavit does not create a genuine issue of material fact.

### Judgment as a Matter of Law

■ The United States asserts that it is entitled to judgment as a matter of law on the basis of res judicata, and the judgment entered on the settlement bars the present quiet title action. The plaintiff argues that res judicata is inapplicable because it could not have raised a quiet title issue before the Commission. The plaintiff cites several cases for the proposition that the Commission could only decide the monetary claims and could not quiet title. Under such circumstances, res judicata is not proper because the claim could not have been litigated in the prior case. *See Robbins v. District Court of Worth County*, 592 F.2d 1015, 1017 (8th Cir.), *cert. denied*, 444 U.S. 852, 100 S.Ct. 107, 62 L.Ed.2d 69 (1979).

The United States' argument is more correctly construed as an affirmative defense based on compromise and settlement. As pointed out in the foregoing discussion, the lake was included in the $1.50 per acre settlement. Although a quiet title proceeding could not have been heard by the Commission, the compromise settlement is properly construed as being an election of remedies. The Court of Appeals for the Fourth Circuit recently discussed this.

A compromise and settlement may act as a bar to further action on the antecedent claim that forms the basis of the compro-

mise. *See* 15A Am.Jur.2d *Compromise and Settlement* § 24 (2d ed.1976). If the claim that was compromised could have sought a different remedy, such as an action for damages rather than the injunction that Piver originally threatened to seek, then the compromise can act as a binding election of remedies. *Id.*

*Piver v. Pender County Board of Education*, 835 F.2d 1076, 1083 (4th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988). The plaintiff has elected a remedy, monetary relief, and is now barred from seeking alternative relief.

■ The claim of the United States is an affirmative defense. It was not raised in the answer. The plaintiff claims that it is therefore waived. F.R.Civ. P. 8(c). As a general matter, failure to plead such an affirmative defense results in its waiver. Exceptions are recognized, however, as in *Echols v. Strickland*, 92 F.R.D. 75 (S.D. Tex.1981). There the court considered a statute of limitations affirmative defense on summary judgment even though it was not raised in the answer. The court noted that the case was in the pretrial stage and that the liberal amendment of pleadings provided under rule 15 would likely permit amendment of the answer. *See Buder v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 690, 694 (8th Cir.1981). For those reasons, the court considered the statute of limitations claim. *Echols*, 92 F.R.D. at 77; *see also Standridge v. City of Seaside*, 545 F.Supp. 1195, 1198 n. 1 (N.D.Cal.1982). The court in *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir.1981) also implicitly recognized the existence of this exception.

The present litigation is in the pretrial stage. If the United States were to move to amend its answer, this court would grant the motion. Further, the matter has been fully presented in the parties' briefs and there is no undue prejudice resulting to the plaintiff. For these reasons, the court considers the issue on its merits.

There are no genuine issues of material fact, and the United States is entitled to judgment as a matter of law. The plaintiff was compensated for Devils Lake through the 1977 settlement reached in docket 363. The settlement covered claims going back to the 1870s. Because the Indian claims to the lake predated the claims of the defendants herein, all of the defendants are entitled to summary judgment of dismissal in the case.

IT IS ORDERED the United States' motion for summary judgment is granted, and that judgment of dismissal be entered as to all defendants in the plaintiff's complaint.

IT IS FURTHER ORDERED costs are not awarded to any of the parties.

EXHIBIT 1

NORTH DAKOTA AND SOUTH DAKOTA 1